UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:

JACK D. PICKEL,

        Case No. 12-13262-TA

    Debtor.

MARY BEOHM,

     Plaintiff,

v.                                    Adv. No. 12-1319-T

JACK D. PICKEL and
ALAMEDA VIRGIN
ISLANDS COMPANY, LLC,

    Defendants.

## <u>MEMORANDUM OPINION</u>

Plaintiff Mary Boehm asks the Court for a declaratory judgment that she validly terminated Alameda Virgin Islands Company, LLC's ("AVIC's") rights under a certain agreement relating to the purchase of stock. Defendants AVIC and Debtor counterclaimed, asserting that Plaintiff's attempted termination was ineffective and asking for specific performance and damages. For the reasons set forth below, the Court will deny Plaintiff's requested relief and grant some of the relief Defendants requested.

I.    <u>FACTS</u>

1.    Debtor formed AVIC and at all times was its sole member and manager.

2.    On or about September 24, 2007, AVIC entered into an agreement (the "Agreement") with Plaintiff and her son Richard "Derryck" Boehm to buy their right, title, and

interest, including all voting, management, and dividend rights, in and to 447.5 shares[1] of the common stock of Club Comanche, Inc., a Virgin Islands corporation (the "Corporation"). The 447.5 shares and all related rights and interests are referred to herein as the "Shares."

3. The Corporation owns, inter alia, the Club Comanche hotel and restaurant in St. Croix, Virgin Islands.

4. The purchase price for the Shares was $800,000, payable in installments. Debtor guaranteed payment of the purchase price.

5. Plaintiff and her late husband had been involved in the ownership and/or management of the hotel since they purchased 50% of the Corporation's stock in 1972.

6. On May 25, 2007, a judgment was entered by the Superior Court of the Virgin Islands, Division of St. Croix, in a case styled *Florence McDonnell v. Mary Boehm, et al.*, SX-02-CV-465 (the "McDonnell Judgment"). The McDonnell Judgment awarded Ms. McDonnell a money judgment against the Corporation of about $433,000 and ordered Plaintiff, her husband, and the Corporation to issue McDonnell 156 shares of the Corporation's common stock.[2]

7. Entry of the McDonnell Judgment prompted Plaintiff to sell her interest in the Shares to AVIC.

8. Despite the clear language of the Agreement, Plaintiff testified at trial that she did not believe she was selling her stock in the Corporation, only her proxy rights. During her testimony, Plaintiff's counsel pointed out this language in paragraph 4 of the Agreement:

> If and when such certificates may be legally transferred to Alameda in compliance with applicable law, any applicable agreement or stipulation of shareholders, by any applicable court order, or provisions of the Articles, Bylaws and other corporate documents of Club Comanche, Inc., which may be applicable, then

---
[1] Plaintiff owned 446.5 shares, while her son owned 1 share.
[2] In an unrelated transaction, AVIC also purchased Ms. McDonnell's interest in the 156 shares awarded to her by the McDonnell Judgment, as well as the $433,000 money judgment.

Case 12-01319-t    Doc 40    Filed 06/07/13    Entered 06/07/13 15:12:04 Page 2 of 24

> Mary Boehm and Derryck Boehm shall transfer to Alameda the shares evidenced by such certificates to Alameda upon demand for one dollar ($1.00) provided Alameda is not in default under this Agreement.

When asked about her understanding of this provision, Plaintiff said the language was just "one of those odd little things that lawyers do."

9.   To memorialize its payment obligation under the Agreement, AVIC executed a Non-Negotiable Promissory Note in the original principal amount of $800,000, payable to the order of Plaintiff (the "Note").

10.   AVIC paid $550,000 of the purchase price.

11.   The final installment payment of $250,000 was due November 1, 2009.

12.   AVIC did not pay the final installment on the due date.

13.   Plaintiff testified that after AVIC defaulted, she reviewed her default remedies under the Agreement and elected to exercise her option to terminate the Agreement and declare it null and void. Plaintiff also testified that her daughter reviewed the termination option language in the Agreement and laughed, saying "they put that in, because they never expected it to happen . . . ."[3]

14.   On November 2, 2009, Plaintiff hand delivered to Defendants' counsel a notice of payment default, stating, inter alia, that the last day to cure the default was November 13, 2009.

15.   A different default notice had been drafted by Eszart A. Wynter, Sr. Esq., Plaintiff's counsel at the time. However, Plaintiff testified that when she was driving home from Mr. Wynter's office, she had her car windows down and Mr. Wynter's default notice blew out of the car and was lost.

---

[3] It appeared from Plaintiff's testimony that her daughter is an attorney, but that was never established.

16.     Plaintiff further testified that, instead of going back and getting another copy from Mr. Wynter's office, she and her daughter drafted a default notice, which she then delivered to Defendants' counsel.  The notice did not give an address where the payment should be made.

17.     Paragraph 15 of the Agreement provides in part that "Alameda shall be deemed in default, if after ten (10) business days after receipt of written notice of default, Alameda fails to cure the default and remains in breach of this Agreement or the promissory note attached hereto as Exhibit 'A.'"

18.     Plaintiff, her daughter and/or Mr. Wytner miscounted the cure period, perhaps missing the plain language in ¶ 15 that the period was ten *business* days rather than ten *calendar* days.  The cure period actually ended November 17, 2009.[4]

19.     Plaintiff never corrected or attempted to correct the error.

20.     On November 12, 2009, Mr. Wynter drafted and signed a letter to Debtor, purporting to terminate the Agreement and declare it null and void.  After consulting with Plaintiff, Mr. Wynter waited until November 13, 2009 to hand deliver the letter to Debtor.

21.     The termination letter, inter alia, demanded immediate possession of the hotel, demanded keys, terminated Defendant's employment by the Corporation, ordered all employees to vacate the hotel, and terminated all corporate directors.

22.     The uncontradicted evidence before the Court is that AVIC attempted to cure the default within the cure period, including a tender of full payment delivered to Mr. Wynter on November 16, 2009.  Mr. Wynter refused to accept the tender.

---

[4]  The Note has a different cure period.  It specifies "ten (10) days."  However, if the Note default is not cured within ten days, the remedy specified in the Note is to accelerate the amounts due under the Note.  Since the $250,000 payment due was the final payment, this remedy apparently did not give Plaintiff sufficient relief, so she proceeded under the default provisions of the Agreement.

-4-

23.     The payment address specified in the Note is the Club Comanche hotel address, i.e., 1 Strand Street, Christiansted, St. Croix, Virgin Islands, 00820.[5]  Defendant testified that AVIC had a check waiting for Plaintiff to pick up, at the specified hotel address, and left a message on Plaintiff's answering machine to pick up the check at the hotel.  Plaintiff did not do so.

24.     Plaintiff testified that she never received such a message from Defendant.

25.     The proposed cure was in the form of a check dated November 16, 2009 for $250,369.86, drawn on Debtor's bank account at the Bank of the Rio Grande in Las Cruces, New Mexico (the "Cure Payment Check").

26.     Debtor testified that there were insufficient funds in the account on November 16, 2009 to honor the Cure Payment Check.  However, Debtor testified he had made arrangements to borrow the necessary funds from Duane Bobeck, a real estate investor who lives in the Virgin Islands.

27.     Debtor testified that had Plaintiff accepted the Cure Payment Check, Debtor would have immediately executed the necessary loan documents prepared by Mr. Bobeck's attorney, Donovan Hamm, and would have wired the funds to the Bank of the Rio Grande account.  Debtor testified that the loan documents were ready and waiting for him to sign, and that he had spoken to a bank officer, who was ready to accept the wire transfer and honor the check if presented.

28.     Debtor's testimony about the loan from Mr. Bobeck is corroborated by a November 17, 2009 e-mail from Mr. Hamm to Debtor.

---

[5]  Before Plaintiff signed the Agreement, she lived at the hotel.  After she moved out, she never gave Defendants a new address for making payments.  There is no evidence about where previous payments were made.

29.     There is no evidence about the form of prior payments.  Neither the Agreement nor the Note prohibits payments by United States check.  At trial, Plaintiff did not argue that payment by a check drawn on a New Mexico bank was improper, only that the Cure Payment Check could not have cured the default because the bank account had insufficient funds.

30.     Mr. Hamm asked Mr. Wynter on November 13, 2009 where Plaintiff was.  Mr. Wynter responded that he was unaware of Plaintiff's whereabouts.  At trial, Plaintiff expressed surprise at this answer, because Mr. Wynter did know where she was.

31.     It appears that Plaintiff and/or Mr. Wynter sought to avoid Defendants' attempts to cure the payment default.

32.     The evidence before the Court is that Plaintiff at some point became committed to getting the Shares back, rather than collecting the remaining $250,000.  This desire may explain why she, her daughter, and/or Mr. Wynter misread the cure period in the Agreement, refused to correct their error once it became known, and apparently made efforts to thwart Defendants' cure attempts.

33.     Ms. Boehm has been involved in litigation over the Club Comanche hotel for years.  Her 1992 Property Settlement and Separation Agreement with her husband, the late Richard Boehm, refers to a case involving the hotel.  The McDonnell Judgment (which concerned the hotel and Corporation stock) refers to at least three other hotel-related suits involving Ms. Boehm.  The estate of Mr. Boehm sued Plaintiff and others in 2008, seeking declaratory and other relief.  In a brief filed in that case, Plaintiff referred to a case filed in 1996 by Mr. Boehm against Plaintiff, Civil no. 327/96.  Thus, this adversary proceeding appears to be

at least the ninth civil action Ms. Boehm has been a party to concerning the Club Comanche hotel.[6]

34.     Debtor testified he spent about $1,900,000 repairing and improving the hotel and restaurant after the Agreement was signed, in addition to the amounts paid by AVIC for the Shares and Ms. McDowell's shares.

35.     Defendant testified that, in his opinion, Club Comanche was worth about $2,000,000-$2,500,000 when AVIC signed the Agreement in 2007, and was worth about $5,000,000-$5,500,000 in November, 2009 when Plaintiff purported to terminate the Agreement.

36.     Plaintiff filed a complaint for declaratory judgment and injunctive relief on November 25, 2009 in the Superior Court of the Virgin Islands, Division of St. Croix, commencing cause no SX-09-CV-545 (the "545/09 case"). In her complaint Plaintiff asks for, inter alia, a declaratory judgment that she validly terminated the Agreement, and that the Agreement is null and void.

37.     Plaintiff obtained a temporary restraining order in the 545/09 case on December 14, 2009 (the "TRO"), which, inter alia, evicted Defendants from the Club Comanche hotel.

38.     In her affidavit in support of the TRO request, Plaintiff stated she and her son together owned a majority of the Corporation's shares of common stock.

39.     That statement does not appear to have been accurate. Rather, it appears that Plaintiff and her son owned 447.5 shares of stock, or 42.6% of the Corporation's shares.[7]

---

[6]  Using the numbering system employed by the judge in the McDonnell Judgment, Plaintiff has been a party to Virgin Islands civil actions 320/96; 327/96; 710/96; 718/96; 465/02; 363/08; 545/09; the case referred to in the Property Settlement and Separation Agreement; and this adversary proceeding.

[7]  The main difference between Plaintiff's claim of majority ownership and the 42.6% figure lies in Ms. McDonnell's 156 shares awarded in the McDonnell Judgment. Plaintiff contends that the judgment is subject to modification or reversal. At present, however, the McDonnell Judgment appears to be a final judgment, binding on Plaintiff. Because of that, Plaintiff's claim of current majority ownership appears weak.

40. The Court presiding over 545/09 case dissolved the TRO on December 18, 2009. Debtor testified that one reason the court dissolved the TRO was Plaintiff's alleged misrepresentation about her majority stock ownership. The partial hearing transcript supports this, although it is possible that the missing portions of the transcript would indicate otherwise.[8] Another reason, stated in the court's order dissolving the TRO, was that the parties to the Virgin Island Action were the Corporation's stockholders, not the Corporation. Because the Corporation was not a party, the court determined it had no jurisdiction over it. Finally, the court determined that Plaintiff had not proven that she would be irreparably harmed without the TRO.

41. The TRO caused Defendant to be dispossessed for about four days.

42. AVIC filed an answer and counterclaim in the 545/09 case. After initial litigation over the TRO, little has happened in the 545/09 case, although Plaintiff filed a Motion for Status Conference and a Certificate of Readiness on January 5, 2011.

---

[8] Defendants submitted as proposed Exhibit BB a partial transcript of the December 18, 2009 hearing held in the 545/09 case. Plaintiff objected to the admission of the partial transcript under Fed. R. Evid. 106, arguing that in fairness the rest of the transcript should be admitted as well. The parties agree that the rest of the transcript was not available at trial. Defendants obtained the partial transcript from the publicly available docket in the 545/09 case. The Court said that it would review the case law on Fed.R.Evid. 106 after the trial and determine the admissibility of the partial transcript. Having done so, the Court will admit the partial transcript as Defendants' Exhibit BB. In general, courts are not required to exclude transcripts or recordings simply because some portion is unavailable. *See, e.g., State v. Womble*, 343 N.C. 667, 688-89, 473 S.E.2d 291, 303-04 (1996), *cert. denied*, 519 U.S. 1095 (1997) ("A tape recording should not be excluded [under Rule 106] merely because parts of it are inaudible if there are other parts that can be heard."). Instead, courts look at whether: (1) the evidence was destroyed in bad faith; and (2) the missing portions are necessary to clarify or explain the portion already in evidence. *See U.S v. Ferguson*, 2010 WL 3521992, at *78 (4th Cir. 2010), *cert. denied*, 131 S. Ct. 968 (2011) (admitting the remaining pieces of defendant's letters where defendant failed to argue that the government improperly destroyed evidence or that the remaining pieces were taken out of context); *U.S. v. Sherman*, 2008 WL 4229897, at *2 (3rd Cir. 2008) (the remainder of a video was admissible even though a potentially relevant segment was destroyed, on the ground that the opposing party had not demonstrated that the segment was destroyed in bad faith). *See also Campbell v. RAP Trucking Inc.*, 2011 WL 3924157, *3 (C.D. Ill. 2011) (admitting portions of log books because the remainder of logs were not destroyed in bad faith); *U.S. v. Codrington*, 2008 WL 1927372, at *15 (E.D.N.Y. 2008) (admitting a portion of a video tape where the remainder was inadvertently destroyed because the defendant suffered no prejudice as a result). The Court finds that Defendants did not destroy the missing portions of the transcript, and also finds that such portions are not necessary to clarify or explain the portions contained in Exhibit BB.

43.     In January, 2011, Plaintiff filed a lis pendens on the real property owned by Club Comanche (the "Lis Pendens").  It does not appear Plaintiff has any direct claim against the property, and the Lis Pendens therefore appears to be improper.

44.     Debtor filed bankruptcy August 28, 2012.

45.     Plaintiff commenced this adversary proceeding November 23, 2012, asking the Court to rule that Defendants have no interest in the Shares, and declaring the Agreement null and void.

46.     Defendants answered and counterclaimed, asking the Court to enforce their rights under the Agreement by specific performance, requiring Plaintiff to accept the final payment, and award damages.

47.     On or about February 4, 2013, Debtor took actions in his capacity as the sole member and manager of AVIC to dissolve AVIC and transfer all rights under the Agreement from AVIC to himself.[9]

48.     This is a core matter.  The parties have consented to the Court entering a final judgment.

## II.     DISCUSSION

A.     Choice of Law.

The Agreement, ¶ 19, states that it shall be governed by and construed under the laws of the Territory of the United States Virgin Islands.  The Agreement is between Virgin Islands residents, concerns a Virgin Island corporation that owns Virgin Islands real estate, and was signed in in the Virgin Islands.

When a federal court sits in diversity, it generally applies the choice-of-law rules

---

[9]  The final judgment to be entered in this adversary proceeding will affect the rights of Debtor and AVIC as their interests may appear.

Case 12-01319-t     Doc 40     Filed 06/07/13     Entered 06/07/13 15:12:04 Page 9 of 24

of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941). It does so to avoid intrastate forum-shopping and inconsistent results. *Id.* at 496, 313 U.S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477. However, a federal bankruptcy court's jurisdiction does not arise from diversity, but from federal bankruptcy law, which has a goal of national uniformity rather than congruence with state law. Yet state law governs the validity of most property rights, and except when the bankruptcy code specifies otherwise, bankruptcy courts must apply the relevant state law. *Butner v. United States*, 440 U.S. 48, 54, 99 S. Ct. 914, 59 L.Ed.2d 136 (1979); *In re Wright*, 492 F.3d 829, 832 (7th Cir. 2007) ("[S]tate law determines rights and obligations when the [Bankruptcy] Code does not supply a federal rule.").

*Jafari v. Wynn Las Vegas, LLC (In re Jafari)*, 569 F.3d 644, 648 (7th Cir. 2009), *cert. denied*, 558 U.S. 1114 (2010). *See also Dang v. UNUM Life Ins. Co. of America*, 175 F.3d 1186, 1190 (10th Cir. 1999) ("A federal court adjudicating state law claims must apply the forum state's choice of law principles.") (*citing Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941)); *Cain v. Settlement Capital Corp. (In re Cain)*, 356 B.R. 787, at *4 (10th Cir. BAP 2007) ("We start with the fundamental rule that a federal court is to apply the choice of law rules of the forum in which it presides.") (unpublished).

In *Ferrell v. Allstate Ins. Co.*, 144 N.M. 405, 421–22, 188 P.3d 1155, 1172–73 (2008) the New Mexico Supreme Court approved the use of the Restatement (Second) of Conflict of Laws (1971) with respect to contract conflicts. Under the Restatement, if the contract has a valid choice-of-law provision, that law presumptively applies. Restatement (Second) § 187.

> In the absence of an enforceable choice-of-law provision, and if the rules regarding specific types of contracts or specific issues in contract do not supply the law to be applied, the Restatement (Second) relies on the "most significant relationship" test which is used to determine which state has the most significant relationship to the transaction and to the parties. *Id.* § 188(1), at 575. A court considers a variety of contacts when making a determination about which state's law applies to the dispute. *See id.* (listing the following relevant contacts "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties"). Significantly, a court must consider both the number of contacts in a given jurisdiction, and even more importantly, the quality of those contacts. *See*

-10-

*id.*

*Ferrell*, 144 N.M. at 422-23, 188 P.3d at 1172-73.

Under New Mexico law, a New Mexico court likely would honor the choice of law provision and apply Virgin Islands law. However, even without the choice-of-law provision, the Restatement's "most significant relationship" test mandates application of Virgin Islands law. Therefore, this Court will apply Virgin Islands contract law.

B.    Plaintiff's Notice of Default Was Defective.

The cure deadline set forth in Plaintiff's default notice was wrong—it should have stated that November 17 was the last day to cure, not November 13. Such defects sometimes require the non-defaulting party to send a new default notice. *See, e.g., Queiroz v. Harvey*, 220 Ariz. 132, 136, 204 P.3d 390, 395 (Ct. App. 2009), *vacated on other grounds,* 220 Ariz. 273, 205 P.3d 1120 (2009) ("Our cases teach that when a breach occurs and the contract provides an exclusive procedure for cancellation upon breach, the non-breaching party's failure to follow that procedure leaves the contract intact and allows the breaching party to cure the breach"); *Commercial Investment Corp. v. Siggard,* 936 P.2d 1105 (Utah App. 1997), *cert. denied,* 945 P.2d 1118 (1997) (because forfeitures are undesirable, a party seeking forfeiture *must comply strictly* with the notice provisions of the contract") (emphasis in original); *Federal v. Ortiz,* 139 Misc. 2d 274, 528 N.Y.S.2d 305 (N.Y. Civ. Ct. 1988) (landlord notice that did not comply with city code was ineffective); *Vermont Small Business Devel. Corp. v. Fifth Son Corp.,* __ A.3d __, 2013 WL 278259, ¶ 15 (Vt. 2013) ("In Vermont, when a lease expresses an agreement with regard to notice of termination, the time, mode and manner of such notice must confirm to the agreement").

Here, the Agreement does not require Plaintiff to state the cure period, and Debtor is

sophisticated. Debtor readily determined that the cure period in Plaintiff's default notice was wrong. Because of these facts, the Court concludes that Plaintiff was not required to send a new notice with the correct cure period.

       C.      <u>Plaintiff's Purported Termination of the Agreement Was Ineffective</u>.

It is clear that AVIC had until the end of November 17, 2009 to cure its payment default. On November 13, 2009, however, four days early, Plaintiff purported to terminate the Agreement, declare it null and void, and strip AVIC of all rights it obtained under the Agreement.

       1.      <u>Plaintiff's Actions Constituted an Anticipatory Breach of the Agreement</u>.

Plaintiff's improper declaration of termination was plainly contrary to the Agreement, and constituted an anticipatory breach of the Agreement. In *United Corp. v. Reed, Wible and Brown, Inc.*, 626 F. Supp. 1255 (D.V.I. 1986), the court discussed anticipatory breach:

> Repudiation occurs when a party to a contract makes clear his intent to breach the agreement before the time to perform has arrived. *E.g., Bill's Coal Co., Inc. v. Board of Public Utilities of Springfield, Mo.*, 682 F.2d 883, 886 (10th Cir.), *cert. denied*, 459 U.S. 1171, 103 S. Ct. 816, 74 L. Ed. 2d 1014 (1982); *City of Fairfax, Va. v. Washington Metropolitan Area Transit Authority*, 582 F.2d 1321, 1325 (4th Cir.), *cert. denied*, 440 U.S. 914, 99 S. Ct. 1229, 59 L. Ed. 2d 463 (1978); 4 Corbin, Contracts, § 959 (1951). The remedy for anticipatory breach, as repudiation is also known, is the right of the non-breaching party to immediately seek damages for a total breach of the contract. *Fairfax, supra* at 1325; Restatement (Second) of Contracts § 253 (1981); Corbin, *supra* § 964.
>
> Two elements must exist in order to support a finding of repudiation. First, the obligation repudiated must be so essential to the purpose of the contract that non-performance makes the agreement worthless. *Fairfax, supra* at 1327 [*citing McCloskey & Co. v. Minweld Steel Co.*, 220 F.2d 101 (3d Cir.1955)]; Restatement, *supra* § 250, comments b and c; Corbin, *supra*, § 973. Otherwise, only a partial breach may be found. Secondly, there must be an "absolute and unequivocal refusal to perform." *McCloskey, supra* at 104. *See also Dingley v. Oler*, 117 U.S. 490, 502, 6 S. Ct. 850, 853, 29 L. Ed. 984 (1886); Restatement, *supra* § 250, comments b and c. Thus, courts have refused to find repudiation where a party has merely threatened non-performance or has offered to rescind the contract. *E.g., Harrell v. Sea Colony, Inc.*, 35 Md. App. 300, 370 A.2d 119,

123 (1977).

It is not required that the breaching party make a point blank declaration, because an act may also constitute repudiation. Restatement, *supra* § 250(2); Corbin, *supra* §§ 959, 973. It must, however, be "a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach." Restatement, *supra* § 250(a).[10]

626 F. Supp. at 1257.

A more recent case recognized an additional element that the non-breaching party must establish to be eligible for a damages award:

Section 244 of The Restatement (Second) of Contracts provides that "[a] party's duty to pay damages for total breach by non-performance is discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise." Restatement (Second) of Contracts § 244. Similarly, § 254 provides that "[a] party's duty to pay damages for total breach by repudiation is discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise." *Id.* at § 254. Accordingly, whether the breach is classified as nonperformance or repudiation, the non-breaching party must have been capable of performing absent the breach in order to recover damages.

As set forth in Williston on Contracts:

the party claiming that an anticipatory repudiation has excused the performance of a condition precedent *must show that but for the repudiation, he or she would have been ready, willing, and able to perform his or her obligations under the contract, at least where the defendant-that is, the repudiating party-places in issue the ability of the plaintiff to perform.*

Richard A. Lord, 13 Williston on Contracts § 39.41, at 692-93 (4th ed. 2000) (emphasis added). The non-breaching party need not tender performance to establish this willingness, but rather "need only show that before the repudiation, he or she was ready, willing and able to perform, and would have rendered that

---

[10] The Virgin Islands Code, V.I. Code Ann. tit. 1, § 4 provides:

**Application of common law; restatements**

The rules of the common law, as expressed in the restatements of the law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary.

For this reason, there are references to the Restatements in the Virgin Islands cases on contract law. In addition, the Restatements provide answers to questions not yet addressed by Virgin Islands courts.

-13-

performance had the other party not repudiated." *Id.* at 695 (emphasis added). Finally, with respect to the availability of damages for the non-breaching party, "where the parties are to exchange performances under a bilateral contract, while an anticipatory repudiation generally releases the nonbreaching party from any duty to perform, the repudiation does not relieve the nonbreaching party from showing an ability to perform in order to obtain a remedy ." *Id.* (emphasis added).

*Bennington Foods, L.L.C. v. St. Croix Renaissance Group, L.L.L.P.*, 2010 WL 1608483, at *10 (D.V.I. 2010). *See generally* Restatement (Second) of Contracts § 250 (repudiation entails a statement or "voluntary affirmative act" indicating that the promisor "will commit a breach" when performance becomes due).

Plaintiff argued she did not repudiate the Agreement because she thought she was proceeding in accordance with it. In support of this argument she cited *Pacific Coast Engineering Co. v. Merritt-Chapman & Scott Corp.*, 411 F.2d 889, 894 (9th Cir. 1969) (generally, when there is a disagreement as to the meaning of terms in a contract, one party's offer to perform in accordance with his interpretation is not itself an anticipatory breach), and *Ricketts v. Adamson,* 483 U.S. 1, 18 (1987) (in a dissenting opinion, Justice Brennan cited case law in support of the proposition that a party taking a position interpreting a contract does not commit an anticipatory breach, even if that position turns out to be mistaken).

As cited above, the Virgin Islands follows the American Law Institute's Restatement of the law. The Restatement (Second) of Contracts, § 250, comment d, states "Generally, a party acts at his peril if, insisting on what he mistakenly believes to be his rights, he refuses to perform his duty." *See also United California Bank v. Prudential Ins. Co.,* 140 Ariz. 238, 278, 681 P.2d 390, 430 (Ct. App. 1984):

> The *Restatement, Corbin* and *Williston* -the three leading authorities on American contract law-unanimously endorse the position that an anticipatory repudiation may be based upon an erroneous contract interpretation just as it may be based upon a refusal to perform for any other reason. The *Restatement* is particularly significant since our Supreme Court "has consistently held that it will generally

-14-

follow the Restatement of Law unless a different rule has been pronounced by the court in prior decisions or by legislative enactment." *Irwin v. Murphey,* 81 Ariz. 148, 152, 302 P.2d 534, 537 (1956). In Arizona no different rule has been pronounced. The *Restatement* provides:

> Generally, a party acts at his peril if, insisting on what he mistakenly believes to be his rights, he refuses to perform his duty. His statement is a repudiation if the threatened breach would, without more, have given the injured party a claim for damages for total breach.

2 *Restatement (Second) of Contracts* § 250, cmt. d, at 274-75 (1981). Illustration 9 amplifies the comment with an example showing that a statement by a party to a contract that he will perform only in accordance with his own erroneous interpretation of that contract is a repudiation.

Based on this law, the Court concludes that Plaintiff's "mistaken contract interpretation" defense must be overruled.

Furthermore, in this case there is no issue about the proper interpretation of the Agreement. The default and cure terms were reviewed by Plaintiff, her daughter, and Mr. Wynter. They did not misinterpret the cure provision in some defensible but erroneous way. Instead, they either made a serious mistake or else elected to assert an interpretation they knew was wrong. Either way, the exception to the anticipatory breach rule Plaintiff advocates would not apply.

> 2. <u>Defendants Tendered an Adequate Cure</u>. In any event, AVIC timely tendered a cure of the payment default, which was sufficient to avoid termination of the Agreement for breach. AVIC tendered the payment at the address specified in the Note, and also tendered the payment to Plaintiff's counsel, who refused to accept it. Further, Mr. Hamm asked Mr. Wynter where Plaintiff could be found, and Mr. Wynter inexplicably responded that he did not know.

Wrongful rejection of a cure tender does not allow the party to proceed with default. *See,*

-15-

*e.g., Arkla Energy Resources v. Roye Realty and Developing, Inc.,* 9 F.3d 855, 862 (10th Cir. 1993) (buyer's wrongful rejection of seller's cure tender meant that buyer could not collect damages for alleged breach); *Midwest Precision Services, Inc. v. PTM Industries Corp.*, 887 F.2d 1128, 1136 (1st Cir. 1989) (buyer liable to seller because of wrongful rejection of cure); *In re Kroh Bros. Development Co.,* 91 B.R. 525, 541 (Bankr. W.D. Mo. 1988) (landlord's default notice was defective, and tenant's cure tender was sufficient, so landlord could not refuse the tender and claim that the lease was terminated, citing *Parker v. Unigard Ins. Co.*, 44 Ohio App. 2d 199, 337 N.E.2d 181, 183 (1975) and *Hefner v. Hall*, 223 Ga. 148, 154 S.E.2d 197, 199 (1967). Tender, when made or waived, satisfies the requirement for payment. *Hefner v. Hall*, 223 Ga. at 150, 154 S.E.2d at 199, citing *Anderson v. Barron,* 208 Ga. 785, 69 S.E.2d 874 (1952); *Bank of LaFayette v. Giles,* 208 Ga. 674, 60 S.E.2d 78 (1952). Tender is unnecessary if the other party has stated that the amount due would not be accepted. *Hefner v. Hall*, 223 Ga. at 150, citing *Finney v. Blalock*, 206 Ga. 655, 58 S.E.2d 429 (1950).

Furthermore, in cases of anticipatory breach, proof of actual tender is not essential. *Bennington Foods*, 2010 WL 1608483, at *10. Defendants introduced uncontradicted evidence of their ability to cure the default, which is all that is required. *Id.*

3.    The Law Abhors a Forfeiture.  It is reasonably clear that Plaintiff's goal was not collection of the final $250,000 payment, but recovery of her Club Comanche stock. The uncontradicted evidence in this proceeding is that the Comanche Club hotel was worth about $5,000,000 in November, 2009. 42.6% of this value is about $2,120,000. Allowing Plaintiff to regain stock worth this amount to satisfy a $250,000 debt would be akin to a forfeiture, contrary to the general rule that the law abhors a forfeiture. *See Sunshine Shopping Center, Inc. v. Kmart Corp.,* 85 F. Supp. 2d 537, 544 (D.V.I. 2000) ("The law states that forfeiture clauses in leases are

-16-

generally not favored and that "equity abhors a forfeiture," citing *Lodge, Inc. v. Caravelle Restaurant, Inc.,* 20 V.I. 268, 276 (V.I. Super. 1984). *See also Walker v. Graham,* 706 P.2d 278, 281 (Wyo. 1985) (forfeitures are not favored and equity abhors a forfeiture); *State el rel. Redman v. $122.44,* 231 P.3d 1150, 1155 (Okla. 2010) (law abhors forfeitures); *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181 (D.C. App. 2009) ("equity abhors forfeitures . . . [and] so indeed does the law."). Forfeitures sometimes are allowed when the parties' rights are clear. Where, as here, the party seeking forfeiture did not strictly follow the contract documents and apparently evaded a cure tender, forfeiture need not and should not be allowed.

       D.      <u>The Agreement Still Binds Both Parties</u>.

Because Plaintiff's efforts to terminate the Agreement were ineffective, the Agreement remains in full force and effect. Defendants are entitled to all of their rights under the Agreement, and Plaintiff is entitled to the benefit of her bargain as well, namely the payment of the final $250,000 payment due to her.

       E.      <u>Defendants Have the Right to Specific Performance if They Make the Final Payment</u>.

Defendants ask that the Court order Plaintiff to specifically perform the Agreement and accept the final payment.

> Specific performance is available as a remedy for a breach of contract only if: (1) the terms of the contract are sufficiently certain; (2) no adequate remedy at law exists for the breach; (3) the party seeking relief has materially performed his obligations under the contract; and (4) the grant of such relief is not unfair, against public policy, or otherwise inequitable. *See* Restatement (Second) of Contracts §§ 357, 359, 362, 364, 369. The decision to grant the equitable remedy of specific performance rests within the sound discretion of the Court. *See id.* at § 357. "Parties seeking specific performance bear the burden of showing their entitlement to it...." *Utilities, Inc. v. Blue Mountain Lake Assocs., L.P.*, 121 Fed. Appx. 947, 948–49 (3d Cir. Feb. 12, 2005) (unpublished).

*Martin v. Banco Popular de Puerto Rico*, 2009 WL 1421274, at *9 (D.V.I. 2009), *aff'd.*, 379

Fed. Appx. 185 (3d Cir. 2010). In *In re Estate of Todman,* 48 V.I. 166, 2006 WL 3940589 (V.I. Super. 2006), the Virgin Islands Superior Court ruled that legal remedies are inadequate in only two situations:

> (1) where damages would be insufficient because the subject matter of the contract is of such a special nature that it resists translation into quantitative terms—the damage remedy would not be a just and reasonable substitute for or representative of that subject-matter in the hands of the party who is entitled to its benefit; or (2) where damages are impracticable because it is impossible to arrive at a legal measure of damages at all, or at least with any sufficient degree of certainty.

2006 WL 3940589, at *7 (citing *Sheet Metal Workers' Intl. Ass'n Local 18 v. Herre Bros., Inc.*, 201 F.3d 231, 249-50 (3d Cir. 1999). If the contract involves a sale of land, specific performance is normally granted because land is deemed to be unique and damages are deemed inadequate. *Id.* at *5 (citing *Douglas v. Lyles*, 841 A.2d 1, 4 n.4 (D.C. 2004).)

Finally, courts will generally grant specific performance of a contract if it will prevent unjust enrichment. *Id.* at 6 (citing *Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 210 (3d Cir. 2004) and *University of Colo. Found., Inc. v. American Cyanamid Co.*, 342 F.3d 1298, 1311 (Fed. Cir. 2003), *cert. denied,* 541 U.S. 988 (2004)).

The Agreement in this case is clear and certain. There is no question of what duties were owed to each party. In exchange for the payment of $800,000 in installments on a fixed schedule, AVIC was purchasing the voting rights in the Shares owned by Plaintiff in the Corporation, and the actual shares of stock if they became available.

The Court finds that an award of damages would not be sufficient in this case. This Agreement is very similar to a real estate transaction, or at least similarly unique because it transfers control of a Corporation that owns desirable real estate. Also, there is no practical way to compute the damages. In addition to the purchase price of the shares, AVIC invested millions

-18-

of dollars in improving the property and the Debtor has lived at the property and presumably increased its goodwill with its customers. Any damage award would be uncertain and arbitrary.

AVIC has substantially performed under the contract. But for Plaintiff's anticipatory breach, AVIC would have completely performed. AVIC is therefore entitled to the benefits for which it bargained.

Allowing specific performance in this case would not be unfair, against public policy, or otherwise inequitable. The Court finds that specific performance is the appropriate remedy in this case. Therefore, subject to the requirements of 11 U.S.C. § 365, the Court will order specific performance of the Agreement upon payment of all remaining amounts due.

F.    Defendants' Counterclaim.

Defendants brought a counterclaim against Plaintiff, seeking (in addition to specific performance, addressed above) unspecified compensatory and punitive damages. The counterclaim clearly states causes of action for breach of contract and slander of title. Defendants may have intended to assert other causes of action, but if so they were not sufficiently pled to be a basis for recovery.

1.    Breach of Contract. Debtor's testimony at trial was that Plaintiff's improper TRO caused out-of-pocket damages of $2,800 due to the loss of revenue that would have been generated by renting four rooms for seven nights in December, 2009. The Court finds that this claimed loss was supported by the evidence and should be paid by Plaintiff.

Defendants next asked that some of the attorney fees they incurred defending the 545/09 case be reimbursed as an element of contract damages. Defendant's counsel likened the request to an award of consequential damages, citing *Hadley v. Baxendale,* 156 Eng. Rep. 145, 9 Ex. 341 (1854). The request is contrary to the so-called "American Rule," i.e., that attorney fees are

generally not recoverable from the losing side in the absence of a statute or contract provision

allowing the recovery. *See, e.g., Homestead Ins. Co. v. Guarantee Mut. Life Co.,* 459 Fed. Appx.

398, at *6 (5th Cir. 2012) (attorney fees are not recoverable for breach of contract until

authorized by statute or contract, citing *Sher v. Lafayette Ins. Co.*, 988 So. 2d 186, 201 (La.

2008); *Ranger Const. Co. v. Prince William County School Bd.*, 605 F.2d 1298, 1305 (4th Cir.

1979) (to the same effect). The Virgin Islands, however, does not follow the American Rule.

Instead, Section 541 of title 5, Virgin Islands Code, provides:

> (a) Costs which may be allowed in a civil action include:
> . . .
>   (6) Attorney's fees as provided in subsection (b) of this section.
>
> (b) The measure and mode of compensation of attorneys shall be left to the agreement, express or implied, of the parties; but there shall be allowed to the prevailing party in the judgment such sums as the court in its discretion may fix by way of indemnity for his attorney's fees in maintaining the action or defenses thereto; provided, however, the award of attorney's fees in personal injury cases is prohibited unless the court finds that the complaint filed or the defense is frivolous.

*See also Smith v. Government of the Virgin Islands*, 361 F.2d 469 (3d Cir. 1966) (citing the

statute and discussing its parameters and limitations); *Danzig v. Virgin Islands,* 278 F.2d 580 (3d

Cir. 1960) (under this statute, attorney fees may be allowed and taxed against the losing party as

part of costs); *Virgin Islands Housing & Urban Renewal Authority v. 19.0976 Acres of Land,* 172

F. Supp. 333 (D.V.I. 1959) (to the same effect).

Debtor testified that he incurred about $10,000 in attorney fees defending the TRO and

getting it quashed. Had Plaintiff proceeded in accordance with the Agreement, those fees would

not have been incurred. The Court concludes that $10,000 of Defendants' attorney fees are

recoverable as an element of breach of contract damages.

-20-

Defendants next argue that they should recover a portion of their interest expense incurred between December, 2009 and December, 2012. Defendants had a $1,300,000 construction loan from Citizens Bank of Las Cruces, secured by a first mortgage on the hotel. The interest rate was 7.5%. Debtor testified that after December, 2009, he could have obtained low-cost permanent financing at 4% to take out the construction loan, but was prevented from doing so by the 545/09 case, and/or the Lis Pendens. The Court finds that the evidence of the ability to reduce interest expense by refinancing the construction loan is insufficient to form a basis for recovery. While Debtor testified that he spoke with a representative of the United States Department of Agricultural World Development Service about a low interest rate loan or loan guarantee, there was no evidence that such a loan would have been made but for the 545/09 case and/or Lis Pendens. For example, the potential lender was not identified, no loan commitment letter was introduced, and no loan terms or conditions were given. Furthermore, there was no evidence about when such a loan would have closed. The Court finds that the proposed interest expense damages are too speculative and were not sufficiently proven.

2.    Slander of Title. Plaintiff's filing of the Lis Pendens certainly seems to have been improper, and her counsel acknowledged as much at trial. Filing a lis pendens without a colorable claim, right to, or interest in the property subjects the filer to a slander of title claim. *See Ex parte Boykin*, 656 So. 2d 821 (Ala. App. 1994), citing *Taylor v. Baldwin National Bank,* 473 So.2d 489 (Ala. 1985); *Miceli v. Gilmac Developers, Inc.*, 467 So. 2d 404 (Fla. App. 1985), citing *Atkinson v. Fundaro*, 400 So. 2d 1324 (Fla. App. 1981). *See generally Superior Const., Inc. v. Linnerooth*, 103 N.M. 716, 722, 712 P.2d 1378, 1384 (1986) (dissent, collecting cases). *See generally* Restatement (Second) of Torts, § 587, cmt. c (1977) (defendant has an absolute privilege to publish defamatory statements as part of a judicial proceeding as long as the

statements are not *entirely disconnected* with the litigation) (emphasis added). However, no damages were proven for the slander of title except for the interest rate issue discussed above. Since the proof of damage was insufficient, there can be no award for the slander of title claim. Furthermore, it appears to the Court that it would be a relatively easy matter to file a motion in the 545/09 case to quash the Lis Pendens if it is, in fact, as baseless as it appears. Defendants should have done so, and the fact they have not indicates that the Lis Pendens probably is not causing any harm.

     3. <u>Other Possible Claims</u>. Defendants allege that "as a result of the improper restraining order Defendants suffered loss of business, interruption of ongoing operations and renovations, embarrassment in the business community, and lost revenues." This allegation may relate to the breach of contract action, or could be intended to state another cause of action (e.g. malicious abuse of process). If the former, then the claimed damages have been addressed above. Otherwise, the allegation is too vague, general, and fragmentary to state a claim. Furthermore, the only damages proven were the $2,800 in lost profits and $10,000 in attorney fees, awarded above. Defendants made an offhand request for an award to compensate them for damage to their reputation, but these damages were neither proven nor quantified.

  Defendants also allege "Plaintiff has . . . improperly and illegally convened a purported shareholder's meeting . . . of Club Comanche Inc., exercising voting privileges which rightfully belong to Defendant AVIC, allegedly terminating AVIC's voting rights and purportedly removing [Debtor] as an officer and director of Club Comanche, all to Defendant's damage." The Court takes this to be an allegation supporting the breach of contract claim. If so, damages related to that claim have been discussed. To the extent Defendants intended to assert a different claim, they have not done so.

4. <u>Punitive Damages</u>. Punitive damages generally are not awarded in connection with a breach of contract claim  *See Acosta v. Hovensa, LLC*, 2010 WL 695963, at 10 (D.V.I. 2010) (punitive damages "are not permitted merely for a breach of contract," quoting Restatement (Second) of Torts, § 908.)  *See also* Restatement (Second) of Contracts, § 355 ("Punitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable.").  Defendants' only well-plead tort claim is their slander of title claim.  Since the Court did not award any compensatory damages, Defendants cannot obtain punitive damages from Plaintiff.  *See, e.g., McDonald v. Davis*, 2009 WL 1117651, at *1 (D.V.I. 2009) (citing Restatement (Second) of Torts § 908, the district court vacated the jury's punitive damage award because the jury found that plaintiff had not suffered any compensatory damages).

In any event, while the Court is critical of Plaintiff's actions taken in this matter, the Court does not believe Plaintiff's conduct warrants punitive damages.


III.     <u>CONCLUSION</u>

Plaintiff prematurely attempted to terminate the Agreement, with the apparent hope of regaining ownership of the Club Comanche hotel stock.  For the same reason, Plaintiff and her counsel apparently evaded Defendants' cure attempts.  Plaintiff then obtained a TRO, based in part on what apparently was a factual misrepresentation.  The TRO cost Defendants lost profits and attorney fees.  Finally, Plaintiff filed what appears to be an improper Lis Pendens.

The Agreement remains binding on the parties.  Subject to the requirements of 11 U.S.C. § 365, the Court will order specific performance of the Agreement upon payment of all remaining amounts due.  The Court will also award Defendants damages of $12,800.  A separate judgment will be entered.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Date entered on docket: June 7, 2013.

Copies to:

Christopher M. Gatton
10400 Academy Rd., # 350
Albuquerque, NM 87111

Daniel J. Behles
3800 Osuna Rd NE, Suite # 2
Albuquerque, NM 87109